[Cite as *Weisman v. Durrani*, 2026-Ohio-2639.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| KIRSTIN WEISMAN, | : | APPEAL NO. | C-250099 |
| | | TRIAL NO. | A-1706392 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | | |
| Defendants-Appellants. | : | | |

| | | | |
|---|---|---|---|
| TAMMY JONES, | : | APPEAL NO. | C-250241 |
| | | TRIAL NO. | A-1506164 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | *JUDGMENT ENTRY* | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | | |
| Defendants-Appellants. | : | | |

This cause was heard upon the appeals, the records, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 7/10/2026 per order of the court.**

**By:**_____

      **Administrative Judge**

[Cite as *Weisman v. Durrani*, 2026-Ohio-2639.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| KIRSTIN WEISMAN, | : | APPEAL NO. | C-250099 |
| | | TRIAL NO. | A-1706392 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | | |
| Defendants-Appellants. | : | | |

| | | | |
|---|---|---|---|
| TAMMY JONES, | : | APPEAL NO. | C-250241 |
| | | TRIAL NO. | A-1506164 |
| Plaintiff-Appellee, | : | | |
| vs. | : | *O P I N I O N* | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | | |
| Defendants-Appellants. | : | | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: July 10, 2026

*Statman Harris, LLC, Alan J. Statman* and *Benjamin M. Maraan II*, for Plaintiffs-Appellees,

*Taft Stettinius & Hollister LLP, Philip D. Williamson*, *Aaron M. Herzig*, *Russell S. Sayre* and *Lillian F. Rigby*, for Defendants-Appellants.

**CROUSE, Presiding Judge.**

{¶1} Defendants-appellants Dr. Abubakar Atiq Durrani and the Center for Advanced Spine Technologies, Inc., ("CAST") (collectively, "Appellants") appeal from the trial court's judgments entered in favor of plaintiffs-appellees Kirstin Weisman and Tammy Jones (collectively, "Appellees") in their medical-malpractice actions against Durrani and CAST.[1]

{¶2} Following our review of the record and the assignments of error presented for our review, we hold that (1) the trial court erred in failing to grant Appellants' motion for a directed verdict on the claims brought by Weisman because the claims were filed outside of the statute of limitations, (2) the trial court erred in joining Weisman's and Jones's claims for trial because the claims did not share a common question of law or fact, (3) the trial court erred in allowing Dr. Zeeshan Tayeb to offer hearsay testimony about Durrani, (4) the trial court erred in allowing Dr. Ranjiv Saini to testify beyond his expertise as a radiologist, and (5) the trial court erred in allowing cumulative expert testimony on behalf of Appellees.

{¶3} These errors, cumulatively, cannot be found harmless. We accordingly reverse the trial court's judgments and remand the cause for the trial court to enter judgment in favor of Appellants on Weisman's claims and for a new trial on Jones's claims.[2]

---

[1] We sua sponte consolidate these separate appeals into a single opinion and judgment.

[2] Appellees filed motions to dismiss their fraud claims, which were denied by a motions panel of this court because the motions failed to state with particularity the grounds upon which they were based and because they appeared to request relief that this court cannot afford. Appellants and Jones filed supplemental briefs on the issues raised in the motions. Appellees subsequently filed "notice[s] of withdrawal" of their motions to dismiss the fraud claims, which were struck by a motions panel of this court. We decline to revisit our denial of the motions. If Jones wishes to withdraw her fraud claim, she may do so before the trial court.

## I. Factual and Procedural History

**{¶4}** In the case numbered A-1506164, Jones and her husband, Darrell Jones, filed a medical-malpractice action against Durrani and CAST.[3] In the case numbered A-1706392, Weisman filed an amended medical-malpractice action against Durrani and CAST.[4] Both Jones and Weisman asserted in their respective complaints that Durrani had performed unnecessary surgery on them and had not competently performed those surgeries.

**{¶5}** Over Appellants' objection, the trial court granted a motion for group trials filed by multiple plaintiffs with pending lawsuits against Durrani and CAST. In March 2022, the trial court issued a "fifth revised joint trial schedule sequence," providing that the claims filed by Jones and Weisman were scheduled to be tried together.

**{¶6}** In January 2023, Jones and Weisman filed motions for "Rule 42 joinder" asking the trial court to join their cases for trial. The motions argued that the two plaintiffs' cases shared common questions of law and fact, including allegations of negligence and fraud and allegations that Durrani misread radiography results and exaggerated the extent of the pathology in plaintiffs' spines to dupe them into undergoing surgery. The motions further argued that each plaintiff had surgery on the same area of the spine, and that joinder would avoid unnecessary delay and costs and would not prejudice Appellants.

---

[3] The complaint also named Journey Lite of Cincinnati, LLC, as a defendant, but the claims against Journey Lite were dismissed prior to trial.

[4] Weisman was one of the named plaintiffs in a multi-plaintiff lawsuit filed against Appellants in the case numbered A-1604542. Per court order, each plaintiff in that action was ordered to file their own complaint, which Weisman did in the case numbered A-1706392. Weisman's complaint also named Cincinnati Children's Hospital Medical Center, West Chester Hospital, LLC, and UC Health as defendants. Weisman settled with these three defendants and her claims against them were dismissed.

**{¶7}** Appellants opposed the motions for joinder, arguing that the multiple issues, facts, and circumstances unique to each case prohibited joinder. They further argued that joinder would result in unfair prejudice to them from the introduction of improper evidence. The record contains no entry from the trial court ruling on the motions for joinder, but the claims asserted by Jones and Weisman were joined and tried together.

**{¶8}** Appellants filed a motion in limine prior to trial requesting, as relevant to this appeal, an order precluding surgical-standard-of-care testimony from Dr. Saini and hearsay testimony from Dr. Tayeb. The trial court held that if a proper foundation was laid, Dr. Saini would be allowed to opine as to whether Durrani met the standard of care. With respect to Dr. Tayeb, the trial court held that he would be permitted to testify pursuant to the hearsay exception for reputation evidence set forth in Evid.R. 803(21).

**{¶9}** A jury trial on Jones's and Weisman's claims for negligence, fraudulent misrepresentation, battery, and lack of informed consent began on March 6, 2023. Before any testimony was taken, Appellants again objected to the joinder of Jones's and Weisman's claims for trial, arguing that the "cases [were] in no way similar" and noting that different surgeries had been performed on each plaintiff at different levels of the spine. The trial court responded that the differences in the two plaintiffs' cases "gives the jury an opportunity to make sure that they don't confuse the matters and ensure that they keep them separate."

### A. Evidence and Testimony Presented at Trial

#### 1. Tammy Jones

**{¶10}** The evidence presented at trial established that Jones had suffered pain in her middle back, right hip, and right upper leg for approximately one-and-a-half

years before seeing Durrani. Jones had treated with a pain specialist and had received steroid injections and an ablation without obtaining any pain relief. She had not attempted to treat her pain with chiropractic care, physical therapy, or prescription medication.

{¶11} At Jones's first appointment with Durrani, he told her that if she did not have surgery within two weeks, she would be paralyzed. He also told her that surgery would fix her. After examining Jones and reviewing radiographic images that had been taken in 2012, Durrani planned to perform a right-sided transforaminal lumbar interbody fusion at L3-4 and a right-sided hemilaminectomy, foraminotomy and discectomy at L4-5. Durrani's notes indicated that Jones suffered from disc herniations, various forms of stenosis, and anterolisthesis.

{¶12} Durrani performed surgery on Jones on February 22, 2013. Jones testified that she signed an informed-consent form on the morning of surgery, but that neither the terms on the form nor the risks and benefits of the surgery were explained. After Durrani finished the spinal surgery, and while Jones was in the recovery room, it became necessary for Durrani to take Jones back into the operating room and perform another surgery to correct an issue with the hardware he had placed.

{¶13} Jones testified that she had a follow-up appointment with Durrani approximately two weeks after the surgery. Durrani's notes indicated that Jones was "doing very well" and that he had referred her for physical therapy. Jones testified that she began therapy, but that it caused her pain and she elected not to continue. Jones suffered a fall down her basement stairs post-surgery, causing her additional pain. She testified that she had an appointment scheduled with CAST to receive an injection to help manage her pain, but was informed that the office had closed. She subsequently saw Dr. Tan Nichols at the Mayfield Institute.

8

{¶14} Dr. Nichols's records provided that he had ordered updated radiographic images and determined that Jones's pain best fit the L4 distribution. After reviewing Durrani's operative report from the surgery on Jones, he found no evidence that Durrani had performed a right L4-5 decompression during surgery. Dr. Nichols performed spinal surgery, including an L4-5 fusion, on Jones in December 2013.

{¶15} Jones testified about the impact that the surgery performed by Durrani had on her life, stating that it took approximately six months for her to be able to walk with the assistance of a walker and that she suffered from depression post-surgery. She further stated that her post-surgery pain was worse than it had been prior to surgery, but that she had received some relief after being treated by Dr. Nichols. Jones testified that she can no longer play with her grandchildren, and that she cannot sit in a church pew for a long period of time or ride her bike.

{¶16} Jones presented expert testimony from neurosurgeon Dr. Stephen Bloomfield, orthopedic spine surgeon Dr. Keith Wilkey, and radiologist Dr. Saini.

{¶17} Dr. Bloomfield testified that that he agreed with Durrani's surgical plan to perform a right-sided hemilaminectomy and foraminotomy and discectomy at L4-5, but that there was no medical indication for an instrumented fusion at L3-4.

{¶18} Dr. Bloomfield was extremely critical of Durrani's post-surgery operative report because it made no reference to the hemilaminectomy and discectomy at L4-5. He further stated that Durrani violated the standard of care when he failed to document in the operative report that Jones had to be taken back into surgery to correct an issue with the hardware placed during surgery. Further, as to the hardware, Dr. Bloomfield testified that Durrani erroneously indicated the brand of hardware used during the surgery, which was discovered by Dr. Nichols when

performing a revision surgery on Jones.

{¶19} Dr. Bloomfield was also critical of Durrani's post-surgery notes. He testified that the notes from Jones's first post-surgery visit failed to reference the procedure performed at the L4-5 level, and that his notes from a subsequent visit discussed the placement of the hardware at L4-5, a level where no hardware had been placed.

{¶20} Dr. Bloomfield testified that Jones was never at risk of paralysis if she did not have immediate surgery, and that Durrani breached the standard of care in telling Jones that she faced such a risk. He testified that Durrani's surgery on Jones was a failure because it resulted in a nonunion and the instruments and screws that Durrani had placed loosened within six months. He opined that Durrani was negligent both in suggesting the surgery and in his performance of it, and that this negligence was the proximate cause of harm suffered by Jones. Dr. Bloomfield opined that Durrani breached the standard of care in his interpretation of Jones's medical images, and that the damage caused to Jones from this surgery was permanent in nature and left her with a chronic spine problem.

{¶21} Dr. Wilkey opined that Durrani breached the standard of care by performing a fusion surgery on Jones at L3-4 because the surgery was not medically necessary and Durrani had fabricated the results of Jones's medical images. He was critical of Durrani for operating on the left side of Jones's body and for telling Jones that she would suffer paralysis if she did not receive surgery within two weeks. Like Dr. Bloomfield, Dr. Wilkey was critical of the inaccuracies in Durrani's post-surgery notes about Jones and of Durrani's operative report. He testified that the report made no mention of any procedure performed at L4-5 or that Jones had to be taken from the recovery room back into surgery.

{¶22} Dr. Saini testified that there was no evidence that Jones would have been paralyzed if she did not undergo surgery within two weeks of seeing Durrani. He opined that the medical procedures performed on Jones were not reasonable or necessary, that Durrani improperly represented the findings on Jones's medical images, and that it was a breach of the standard of care to fuse L3-4 instead of L4-5, where the pathology was worse. Dr. Saini criticized Durrani's operative report for failing to reflect that he had performed a second operation on Jones and for failing to mention the procedure performed at the L4-5 level. He also criticized Durrani's post-surgery notes for failing to reflect the L4-5 procedure and for improperly reflecting the level at which hardware had been placed.

{¶23} Durrani and CAST presented expert testimony from neuroradiologist Dr. Derk Purcell and neurosurgeon Dr. Patrick William McCormick.

{¶24} Dr. Purcell opined that Durrani met the standard of care in his treatment of Jones and that he did not exaggerate radiographic findings. He testified that Jones's post-surgery images provided evidence that Durrani performed a laminectomy and discectomy at L4-5 and showed improvement at the L3-4 level.

{¶25} Dr. McCormick testified that Durrani's treatment of Jones met the applicable standard of care, that the surgeries performed on her were medically indicated, and that Durrani performed the surgeries with the care and skill of a reasonably prudent spine surgeon. He further opined that Durrani did not exaggerate Jones's symptoms or fraudulently misrepresent the findings on her medical images, and that she derived a benefit from the surgical intervention. He testified that Jones's post-surgery images did not demonstrate a failed construct or a significant loosening of hardware. His testimony addressed various medical records pertaining to Jones in the years after her surgery with Durrani, and he explained that these records indicated

that she was not suffering any issues with her back.

## 2. Kirstin Weisman

**{¶26}** The evidence established that Durrani first performed surgery on Weisman in 2008 at Children's Hospital to correct kyphosis in her spine.[5] Durrani left Children's after Weisman's surgery, and she continued to treat with him at CAST. During a March 2009 appointment at CAST, when Weisman was approximately 17 years old, she indicated that she had numbness in her right hip and right inner thigh, as well as pain in her lower and middle back. She indicated that sitting aggravated her pain, but that she did not otherwise struggle with activities of daily living.

**{¶27}** Durrani initially determined that Weisman was having pain around the lateral femoral cutaneous nerve in the thigh, and he prescribed medication, including a steroid treatment. He also informed Weisman that surgery would fix her. Weisman did not obtain much relief from the medication, so Durrani ordered injections in her right SI joint and her right L5-S1 facet joint. Weisman received no relief from the SI joint injection, but she did receive temporary relief from the L5-S1 facet joint injection. To discern the origin of Weisman's pain, Durrani ordered an L5-S1 diagnostic facet block, from which no relief was obtained.

**{¶28}** Following these injections, Durrani determined that Weisman suffered from advanced L5-S1 facet arthrosis, more marked on the right side, and that she also suffered from a right S1 radiculopathy. His notes indicated that Weisman had exhausted all nonoperative means, including therapy and injections, and that he recommended she receive an L5-S1 bilateral facet fusion. At the same time that he scheduled surgery, Durrani ordered an MRI of Weisman's lumbar spine and a CT scan.

---

[5] This surgery was not the subject of any claims at trial.

Weisman testified that Durrani had talked about surgery on each of her visits and stated that it would fix her.

{¶29} The radiologist interpreting Weisman's medical images indicated that she had "nominal posterior facet arthropathy with capsulosynovitis" and "no compressive discopathy in the lumbar spine." But Durrani indicated that the images reflected "advanced facet arthrosis at the L5-S1 level."

{¶30} Durrani performed the L5-S1 facet fusion on Weisman on December 30, 2009. Weisman testified that she experienced extreme pain in her hip and inner thigh and on the surgery site for approximately 11 months after the surgery. The pain affected her daily activities, and she struggled to bend over and stand or sit for long periods of time. In November 2010, Durrani recommended additional injections, but Weisman elected not to receive them for financial reasons. Weisman saw Dr. Zeeshan Tayeb for her pain in 2014. At that point, she was experiencing pain in her shoulder blade, low back, right hip, right buttock, and inner thigh. Dr. Tayeb recommended pain medication, but Weisman did not want to take the medication. She testified that she has continued to experience pain and has lived her life the best she can, but that she has not seen a doctor to treat her pain since 2014.

{¶31} On cross-examination, Weisman was asked, "At what point did you start to think that Dr. Durrani had done something wrong? Six months after surgery?" She responded, "I mean, when I woke up from—I mean, not specifically right when I woke up. I just knew that my hip pain was still there and something just wasn't right." Weisman elaborated, "I just knew that the pain was still there in my hip and the inner thigh area. I knew something wasn't normal." Counsel asked, "And, at that point, you thought that something had gone wrong with the surgery?" Weisman answered affirmatively.

{¶32} Weisman presented expert testimony from Dr. Bloomfield, Dr. Wilkey, and Dr. Saini.

{¶33} Dr. Bloomfield testified that Durrani's impressions that Weisman suffered from advanced L5-S1 facet arthrosis that was more marked on the right side and a right S1 radiculopathy were "absolutely wrong." He explained that Weisman had suffered no symptoms on the left side of her body, so there was no possibility that she would need treatment on that side. He further explained that an S1 radiculopathy would not cause pain in the area that Weisman's pain was focused.

{¶34} Dr. Bloomfield also criticized Durrani for scheduling Weisman's surgery before examining updated images. He opined that Durrani breached the standard of care in interpreting the medical images and finding that Weiman's arthrosis was "advanced," and that Durrani exaggerated the findings on Weisman's medical images to justify a surgery that was not medically necessary. He further opined that Weisman suffered permanent injury from the surgery and would experience future pain and suffering. Dr. Bloomfield also pointed out that Durrani's notes improperly reflected that Weisman had received physical therapy.

{¶35} Dr. Wilkey testified that Weisman's medical images did not justify the surgery performed. He opined that Durrani breached the standard of care by operating on Weisman and convincing her to undergo a medically unnecessary surgery, and that the surgery proximately caused her harm by destroying a previously normal joint. He further testified that Weisman would need future treatment for her condition.

{¶36} Dr. Saini testified that he disagreed with Durrani's impression that Weisman suffered advanced facet arthrosis at L5-S1 and opined that Durrani's interpretation of Weisman's images caused her to undergo a medically unnecessary surgery. He testified that Durrani made up diagnoses that were not supported by the

14

medical images to justify surgery.

{¶37} Durrani and CAST presented expert testimony from Dr. Purcell and Dr. McCormick.

{¶38} Dr. Purcell testified that Durrani's interpretations of Weisman's medical images were reasonable and within the standard of care, and that Durrani met the applicable standard of care in his treatment of Weisman. He explained that Durrani properly determined, through use of injections and by examining medical images, that Weisman's pain generator was the L5-S1 facet joint, and that the medical images documented Durrani's diagnosis of facet arthrosis and capsulosynovitis.

{¶39} Dr. McCormick testified that Durrani's treatment of Weisman met the standard of care, and that Durrani carried out the surgery with the skill of a reasonably prudent orthopedic spine surgeon. He testified that Weisman benefitted from the surgery, that the benefit became greater over time, and that the medical records he reviewed contained no evidence that Weisman sought treatment for her pain after 2014. Dr. McCormick also opined that there was no evidence that Durrani fraudulently misrepresented or exaggerated the findings on Weisman's medical images, and that the images demonstrated that Weisman suffered significant facet arthrosis. He was not critical of the fact that Durrani scheduled Weisman's surgery before obtaining updated medical images, explaining that the surgery could be canceled if the updated images did not support the diagnosis or planned surgery.

### 3. *Dr. Tayeb*

{¶40} Weisman and Jones also presented, over objection from Durrani and CAST, excerpts from deposition testimony of Dr. Tayeb, an interventional spine, pain, and sports specialist. The excerpts read to the jury provided that Dr. Tayeb had worked with Durrani at CAST, providing pain management before and after surgery and

directing the rehabilitation program.

{¶41} Dr. Tayeb testified that it did not surprise him to hear that Durrani had told patients he would fix them, as that was a phrase he commonly heard Durrani use. Dr. Tayeb explained that he shadowed Durrani for a period and heard him tell patients they could be paralyzed without surgery. He stated that Durrani pushed for patients to have surgery. Dr. Tayeb further testified that it was not uncommon for Durrani to falsely state that patients had gone through conservative treatment prior to surgery.

### B. *Motion for a Directed Verdict on Weisman's Claims*

{¶42} Durrani and CAST moved for a directed verdict on Weisman's claims, arguing that the evidence presented at trial established that she had not filed her claims within the applicable statute of limitations. In support, they pointed to Weisman's testimony that she realized within six months of surgery, which would have been approximately June of 2010, that Durrani had done something wrong. But yet, they argued, she did not file a complaint until 2013.

{¶43} In response, Weisman argued that she was a minor at the time and that her testimony did not specifically state that Durrani had done something wrong. Rather, she contended, it established she knew after surgery that something was still affecting her and was wrong with her condition, and that she continued to treat with Durrani. Weisman argued that no cognizable event had occurred.

{¶44} The trial court denied the motion for a directed verdict without explanation.

### C. *Jury Instructions*

{¶45} The trial court provided the jury with an instruction on Durrani's absence from trial, stating,

> The defendant, Dr. Durrani, has not attended these proceedings

16

in person. He is represented here by counsel. You shall not speculate on why he's not present or consider his absence for any purpose except as instructed below. Dr. Durrani has voluntarily left the jurisdiction, removing himself from plaintiffs' ability to subpoena him to trial. When a party, such as Dr. Durrani, has relevant evidence or testimony within his or her control, and the party failed to produce that relevant evidence or testimony, that failure gives rise to an inference that the evidence or testimony is unfavorable to that party.

**{¶46}** The court further instructed the jury, "Whether an inference is made rests entirely with you. You may not build one inference upon another inference, but you may make more than one inference from the same facts or circumstances."

**{¶47}** The jury was also instructed that it must consider each plaintiff's case separately and that "[a]lthough there are two plaintiffs in these actions, it does not follow from that fact alone that if one plaintiff is entitled to recover, the other plaintiff is entitled to recover. Defendants are entitled to a fair consideration as to each plaintiff's claim, just as each plaintiff is entitled to a fair consideration of that plaintiff's claim against the defendants."

### D. Jury Verdicts

**{¶48}** The jury found that Durrani was negligent in his care for and treatment of Weisman, specifically for his lack of conservative-care measures, missing records, and inflated diagnosis. But it found that the negligence was not a proximate cause of harm to Weisman. The jury further found that Durrani fraudulently misrepresented the necessity for surgery and that this fraudulent misrepresentation proximately caused harm to Weisman. It found in favor of Durrani on Weisman's claims for failure to acquire informed consent and battery.

{¶49} The jury awarded Weisman $43,943.72 in economic damages for past medical expenses. In noneconomic damages, it awarded her $75,000 for past pain and suffering and $125,000 for future pain and suffering. The jury further awarded Weisman punitive damages in the amount of $300,000.

{¶50} Turning to Jones, the jury found that Durrani was negligent for failing to treat her with conservative care, insufficient record keeping, and creating a sense of urgency around surgery. But it found that this negligence was not a proximate cause of harm to Jones. The jury further found that Durrani fraudulently misrepresented the need for surgery and that this fraudulent misrepresentation was the proximate cause of Jones's harm. The jury found for Durrani on Jones's claims for lack of informed consent and battery.

{¶51} Jones was awarded $103,891.14 in economic damages for past medical expenses and $250,000 in noneconomic damages for past pain and suffering. The jury additionally awarded her $300,000 in punitive damages.

### E.  Post-Trial Motions

{¶52} Weisman and Jones filed motions for prejudgment interest.

{¶53} Durrani and CAST filed motions for judgment notwithstanding the verdict and/or a new trial. As relevant to this appeal, the motions argued that the trial court erred in joining Weisman's and Jones's cases for trial, that it was error to admit Dr. Tayeb's hearsay testimony, that the trial court erred in instructing the jury on Durrani's absence, and that the cumulative effect of all errors warranted a new trial.

{¶54} Durrani and CAST also filed motions for a setoff, arguing that they were entitled to a setoff to the jury's award of damages based on settlements that Appellees had reached with other defendants.

{¶55} The trial court denied the motions for judgment notwithstanding the

18

verdict and/or a new trial and for a setoff. Following a hearing, the trial court granted Appellees' motions for prejudgment interest.

**{¶56}** Final orders in both Weisman's and Jones's cases were issued on January 22, 2025.[6] Appellants now appeal.

## II. Statute of Limitations

**{¶57}** In their first assignment of error, Appellants argue that the trial court erred in failing to grant their motion for a directed verdict on Weisman's claims because Weisman's trial testimony established that the claims were filed outside of the statute of limitations.

**{¶58}** A trial court's ruling on a motion for a directed verdict is reviewed de novo. *Lally v. Mukkada*, 2011-Ohio-3681, ¶ 5 (1st Dist.). Pursuant to Civ.R. 50(A)(4), where the trial court, "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party," the court shall direct a verdict for the moving party. *See id.* at ¶ 5.

**{¶59}** The statute of limitations for medical-malpractice claims is set forth in R.C. 2305.113(A), which provides, "Except as otherwise provided in this section, an action upon a medical, dental, optometric, or chiropractic claim shall be commenced within one year after the cause of action accrued." Appellants argue that Weisman's trial testimony established that she filed her medical-malpractice claims outside of the one-year statute of limitations set forth in R.C. 2305.113(A). They acknowledge that Weisman was a minor at the time of surgery, so the statute of limitations was tolled

---

[6] On April 8, 2025, Jones and Appellants filed a stipulation that the claims of Darrell Jones were dismissed with prejudice.

until she turned 18.

{¶60} Before turning to the merits of this argument, we set forth the relevant dates that impact our analysis. Durrani performed surgery on Weisman on December 30, 2009, when she was 17 years old. Weisman reached the age of majority on April 21, 2010. She last treated with Durrani in November 2010, and she first filed a lawsuit against Appellants in Butler County on November 26, 2013.[7]

{¶61} The Ohio Supreme Court has held, "A claim for medical malpractice accrues, and the one-year statute of limitations begins to run, '(a) when the patient discovers, or in the exercise of reasonable care and diligence should have discovered, the resulting injury, or (b) when the physician-patient relationship for that condition terminates, whichever occurs later.'" *Wilson v. Durrani*, 2020-Ohio-6827, ¶ 14, quoting *Frysinger v. Leech*, 32 Ohio St.3d 38 (1987), paragraph one of the syllabus; *see also Hensley v. Durrani*, 2013-Ohio-4711, ¶ 8 (1st Dist.) (explaining that Ohio follows the discovery rule to determine when a claim for medical malpractice accrues).

{¶62} Under this discovery rule, a cause of action's accrual "depends upon the existence of a 'cognizable event.'" *Hensley* at ¶ 9. The term "cognizable event" has been defined as "'the occurrence of facts and circumstances which lead, or should lead, the patient to believe that the physical condition or injury of which she complains is related to a medical diagnosis, treatment or procedure that she previously received.'" *Id.*, quoting *Flowers v. Walker*, 63 Ohio St.3d 546, 549 (1992). Under the discovery rule, "'[c]onstructive knowledge of facts, rather than actual knowledge of their legal

---

[7] Appellants represent that Weisman first filed suit against them on November 26, 2013, in Butler County before filing in Hamilton County as part of the multi-plaintiff litigation against Appellants in the case numbered A-1604542. This fact is not affirmatively established in the record, but is not challenged by Weisman. For purposes of our statute-of-limitations analysis, we accept Appellants' representation that Weisman filed the Butler County complaint on November 26, 2013, which is the earliest date a complaint was filed in her case.

significance' is sufficient." *Id.*, quoting *Flowers* at 549. A patient need not "be aware of the *full* extent of the injury before there is a cognizable event." (Emphasis in original.) *Allenius v. Thomas*, 42 Ohio St.3d 131, 133-134 (1989).

**{¶63}** In determining whether a cognizable event has occurred, a trial court should consider

> when the injured party became aware, or should have become aware, of
> the extent and seriousness of his condition; whether the injured party
> was aware, or should have been aware, that such condition was related
> to a specific professional medical service previously rendered him; and
> whether such condition would put a reasonable person on notice of need
> for further inquiry as to the cause of such condition.

*Fears v. Midwest Eye Consultants*, 2024-Ohio-4611, ¶ 38 (6th Dist.), quoting *Hershberger v. Akron City Hosp.*, 34 Ohio St.3d 1 (1987), paragraph one of the syllabus.

**{¶64}** Weisman's trial testimony established that she continued to experience pain in her hip, inner thigh, and on the surgery site from the date of surgery (December 30, 2009) through November 2010. The following exchange occurred during Weisman's cross-examination regarding her recurrent pain and whether she had knowledge of a cognizable event.

> DEFENSE COUNSEL: Okay. Now, you said after surgery that you didn't get better?
>
> WEISMAN: No.
>
> DEFENSE COUNSEL: At what point did you start to think that Dr. Durrani had done something wrong? Six months after surgery?
>
> WEISMAN: I mean, when I woke up from—I mean, not

specifically right when I woke up. I just knew that my hip pain was still there and something just wasn't right.

DEFENSE COUNSEL: All right. So you knew immediately that Dr. Durrani had done something wrong?

PLAINTIFFS' COUNSEL: Objection.

THE COURT: Overruled. Go ahead and answer, ma'am.

WEISMAN: I didn't say "immediately." I just knew that the pain was still there in my hip and the inner thigh area. I knew something wasn't normal.

DEFENSE COUNSEL: Right. And, at that point, you thought that something had gone wrong with the surgery?

WEISMAN: Yeah.

**{¶65}** Appellants argue that this exchange demonstrated Weisman's knowledge that something was wrong with the surgery performed by Durrani, and that this knowledge was a cognizable event triggering the running of the one-year statute of limitations.

**{¶66}** *Fears* and *Hensley* are instructive in determining whether Appellants' argument has merit. In *Fears*, the court found that a cognizable event had occurred on March 30, 2017, which was more than a year prior to the plaintiff filing suit, where the plaintiff's "*own trial testimony* confirmed that at that time his blurry vision and other problems and symptoms led him to believe that something went wrong during [the doctor's] cataract surgeries" and he acted on that belief by seeking treatment from three other providers. (Emphasis added.) *Fears*, 2024-Ohio-4611, at ¶ 39, 44-45 (6th Dist.).

**{¶67}** In *Hensley*, this court found that the plaintiff's claims were barred by

the statute of limitations in R.C. 2305.113(A) because she failed to file suit within one year of the occurrence of a cognizable event. *Hensley*, 2013-Ohio-4711, at ¶ 10-13 (1st Dist.). The plaintiff in *Hensley* experienced difficulty swallowing after undergoing spinal surgery with Durrani on October 23, 2009. She raised concerns about her trouble swallowing during an appointment with Durrani two weeks after surgery, and he assured her that the condition would get better. Despite Durrani's reassurances, plaintiff's difficulty swallowing persisted and was documented in records from her family physician from December 2009 through November 2010. *Id.* at ¶ 2-3. In January 2011, plaintiff saw another orthopedic spine surgeon, who informed her that her difficulty swallowing was likely a result of Durrani not performing her surgery correctly. *Id.* at ¶ 5. Plaintiff then filed suit against Durrani in January 2012. *Id.* at ¶ 6.

{¶68} The trial court granted summary judgment to defendants after finding that plaintiff's claims were barred by the statute of limitations for medical-malpractice claims. *Id.* In affirming the trial court and holding that a cognizable event had occurred over a year before plaintiff filed suit, we stated,

> It is not necessary for purposes of this appeal to pinpoint exactly when the cognizable event occurred. Ms. Hensley filed her lawsuit on January 17, 2012, and, therefore, we must uphold the trial court's grant of summary judgment if a cognizable event occurred before January 17, 2011. Based upon the undisputed facts before us, there is no question that a cognizable event occurred at least by the time of her November 26, 2010 office visit.
>
> By her own admission, Ms. Hensley's swallowing problems began shortly after the surgery. During her July 29, 2010 appointment, she specifically noted that she had had swallowing difficulties since her

23

"c-spine surgery." By her November 26, 2010 visit, Ms. Hensley had been complaining of swallowing difficulties to her doctors for over a year. By that time, the assurances that Dr. Durrani had given her after the surgery that the condition would get better had been proven false. The barium-swallow test had confirmed to her treating physician that the surgery was a possible cause of her difficulties. And her own comments at the November 26, 2010 office visit suggest that she drew a connection between her surgeries and her swallowing problem. Under these circumstances, we find that by November 26, 2010, a cognizable event had occurred so as to "put [Ms. Hensley] on notice to investigate the facts and circumstances relevant to her claim in order to pursue her remedies."

*Hensley* at ¶ 11-12.

{**¶69**}  In the case at bar, Weisman's testimony established that she continued to experience pain post-surgery. Her testimony indicated that sometime after the surgery, although not "immediately" after, she "knew that the pain was still there in [her] hip and the inner thigh area" and that she "knew something wasn't normal." At that point, she suspected that something had gone wrong with the surgery. The record does not establish an exact date on which Weisman gained this knowledge or suspected that something had gone wrong, but she returned to see Durrani in November 2010 with reports of ongoing pain.

{**¶70**}  As in *Hensley*, we need not determine a single, specific date on which a cognizable event occurred. Weisman's testimony established that a cognizable event occurred sometime between the surgery in December 2009 and Weisman's visit with Durrani in November 2010. While Weisman lacked specific knowledge or

24

confirmation that Durrani had not correctly performed her surgery, such knowledge was not necessary for the limitations period to begin to accrue. *See Hensley*, 2013-Ohio-4711, at ¶ 9 (1st Dist.), quoting *Flower*s, 63 Ohio St.3d at 549 ("'[c]onstructive knowledge of facts, rather than actual knowledge of their legal significance'" is sufficient); *Allenius*, 42 Ohio St.3d at 133-134 (a patient need not "be aware of the full extent of the injury before there is a cognizable event"). The record establishes that by November 2010, Weisman had been put "'on notice to investigate the facts and circumstances relevant to her claim in order to pursue her remedies.'" *Hensley* at ¶ 12, quoting *Flowers* at 549.

{**¶71**} We accordingly hold that a cognizable event occurred, at the latest, by November 2010. This is also when Weisman's physician-patient relationship with Durrani terminated.

{**¶72**} Weisman's lawsuit against Appellants, first filed on November 26, 2013, in Butler County, was filed more than one year after the occurrence of a cognizable event *and* the termination of her physician-patient relationship with Durrani. *See Wilson*, 2020-Ohio-6827, at ¶ 14 (holding that the statute of limitations for a medical-malpractice action begins to run on the later of the patient's discovery of the resulting injury (i.e., a cognizable event) or the termination of the physician-patient relationship).

{**¶73**} We hold that because Weisman's claims were filed outside of the one-year statute of limitations set forth in R.C. 2305.113(A), the trial court erred in denying Appellants' motion for a directed verdict. The first assignment of error is sustained. Having determined that Weisman's claims were barred by the statute of limitations, our analysis of the remaining assignments of error will focus on Jones.

### III. *Motions for Judgment Notwithstanding the Verdict and/or a New Trial*

**{¶74}** In their second assignment of error, Appellants argue that the trial court should have ordered new trials with single plaintiffs. This assignment of error raises a challenge to the denial of their motions for a new trial on the ground of improper joinder. In their third assignment of error, Appellants argue that the trial court should have granted their motions for judgment notwithstanding the verdict and/or a new trial to correct errors in the admission of evidence and with the jury instructions. We address these assignments together.

**{¶75}** We review de novo a trial court's ruling on a Civ.R. 50 motion for judgment notwithstanding the verdict. *Courtney v. Durrani*, 2025-Ohio-2335, ¶ 61 (1st Dist.). A Civ.R. 50 motion challenges the sufficiency of the evidence, and it should not be granted unless reasonable minds can reach only one conclusion and that conclusion is in favor of the moving party. When ruling on a motion for judgment notwithstanding the verdict, we must view the evidence presented in the light most favorable to the nonmoving party. *Id.*

**{¶76}** A motion for a new trial may be granted pursuant to Civ.R. 59(A) for a variety of reasons, and the scope of our review is dependent upon the argument advanced in the motion. *Ravenscraft v. Durrani*, 2025-Ohio-2900, ¶ 95 (1st Dist.). Where the trial court's exercise of its discretionary authority is challenged, we employ a typical abuse-of-discretion standard of review. But where the motion for a new trial raises a legal issue, we conduct a de novo review. *Id.*

**{¶77}** Appellants raise multiple challenges to the denial of their motions under these assignments of error. We address each in turn.

### *A. Joinder*

**{¶78}** Because the trial court's denial of the motion for a new trial on the grounds of improper joinder implicates the court's exercise of its discretionary authority, we review for an abuse of discretion. *Id.* at ¶ 95; *see Courtney*, 2025-Ohio-2335, at ¶ 46 (1st Dist.) (a trial court's decision to consolidate cases under Civ.R. 42(A) is reviewed for an abuse of discretion).

**{¶79}** The joinder of civil actions for trial is governed by Civ.R. 42(A)(1)(a), which provides that a trial court "may" join actions for trial if they "involve a common question of law or fact." As we recently explained in *Wilson v. Durrani*, 2026-Ohio-2279, ¶ 51 (1st Dist.), determining whether two actions should be joined for trial requires a two-step analysis. We elaborated,

> First, the trial court must determine whether the actions being joined present a common question of law or fact. This inquiry falls within the sound discretion of the trial court. . . Second, if two or more actions present a common question, then the trial court may consolidate the actions. *See* Civ.R. 42(A) (indicating that consolidation is discretionary, even where actions present a common question of law or fact).

(Cleaned up) *Id.* We further explained in *Wilson* that a common question of law or fact is one that is "subject to common resolution" and "capable of being resolved with one answer" for all parties. *Id.* at ¶ 59 and 67. Where a common fact is involved, the fact at issue must be material. *Id.* at ¶ 68. After the court identifies a common question of law or fact, it utilizes its discretion to determine whether joinder is warranted. *Id.* at ¶ 51. Relevant considerations to this determination include whether each case involves the same parties and witnesses and the risk of undue prejudice. *Id.*

**{¶80}** Prior to trial, the court gave the following justification in support of its

joinder of Weisman's and Jones's claims for trial:

> The Court has determined to try these—consolidate these cases and try them together because of judicial economy. The witnesses—the expert witnesses that will be testifying in these cases will be testifying in both cases. There will not be any separate witnesses for each case. And given the fact that the defendant is the same and the issues relating to each case are somewhat similar, and for judicial economy and the saving of resources, the Court feels that it's appropriate to consolidate these cases under Rule 42 of the Ohio Rules of Civil Procedure. And these matters will be consolidated for trial.

{¶81} And in denying Appellants' motions for new trials on the ground of improper joinder, the trial court stated that it had properly determined that the two cases shared sufficient commonality of issues to warrant consolidation. It noted that all expert witnesses "were able to provide testimony for and against each of the plaintiffs," which "sav[ed] time and money in the presentation of evidence." The court further explained that the jury's answers to the interrogatories demonstrated that it was able to "successfully parse through the evidence and reach independent conclusions as to both the common and unique questions of law and fact," demonstrating that it had followed the court's instruction to consider each case separately.

{¶82} None of these justifications identified a common question of law or fact that was capable of being uniformly answered. Rather, the trial court focused on the second step of the joinder analysis, without first identifying a common question of law or fact.

{¶83} Jones has not identified a common question of law or fact that would

28

support joinder. And this court has not found one in our review of the records. Each plaintiff's claims were based on the underlying theory that Durrani exaggerated the findings on their respective medical images to induce them to undergo surgery. But to resolve the claims brought in support of this theory, the jury was not confronted with any questions that were capable of resolution without resorting to separate factual proof. *See Wilson*, 2026-Ohio-2279, at ¶ 67 (1st Dist.).

**{¶84}** Even if the two cases did share a common question of law or fact, they lacked "sufficient commonality of issues and parties to warrant joining the cases." (Cleaned up.) *See Jones v. Durrani,* 2024-Ohio-1776, ¶ 21 (1st Dist.); *Eghnayem v. Boston Science Corp.*, 873 F.3d 1304, 1314 (11th Cir. 2017) (consolidation is proper "where [the cases have a] substantial overlap in the issues, facts, evidence, and witnesses" (Cleaned up.)). To be certain, each plaintiff asserted the same claims against the same defendants and presented testimony from the same experts. But the differences between the two plaintiffs are marked.

**{¶85}** Weisman was 17 years old and had undergone a previous surgery with Durrani. Jones was 48 years old and the surgery at issue in her claims was the first that Durrani had performed on her. Weisman suffered from advanced facet arthrosis and Durrani performed a facet fusion at L5-S1 on her. In contrast, Jones suffered disc herniations, stenosis, and anterolisthesis, and the recommended surgery was a right-sided transforaminal lumbar interbody fusion at L3-L4, and a right-sided hemilaminectomy, foraminotomy and discectomy at L4-L5. Not only did the two plaintiffs have a different diagnosis, but Durrani performed different surgeries on them at different levels of the spine. While each plaintiff presented testimony from the same experts, that testimony differed greatly between plaintiffs due to their different conditions and the different surgeries performed.

{¶86} We accordingly hold that the trial court abused its discretion in joining Weisman's and Jones's claims for trial. But this error will only serve as grounds for a new trial if it was not harmless and Appellants suffered prejudice. *See Wilson*, 2026-Ohio-2279, at ¶ 85 (1st Dist.). We need not determine whether the trial court's error in joinder, standing alone, was harmless. As set forth below, we have found multiple additional evidentiary errors in the trial-court proceedings. We therefore examine the impact of the error in joinder in conjunction with the other evidentiary errors that we have identified. *See Setters v. Durrani*, 2020-Ohio-6859, ¶ 60 (1st Dist.) ("the doctrine of cumulative error applies in the civil context").

### B. Dr. Tayeb's Testimony

{¶87} Appellants next argue that the trial court erred in allowing Dr. Tayeb to offer prejudicial hearsay testimony.

{¶88} As set forth above, Dr. Tayeb testified that Durrani often (1) told patients he would fix them and that they would be paralyzed without surgery, (2) pushed for surgery, and (3) misrepresented whether patients had attempted conservative care prior to surgery.

{¶89} Prior to trial, the trial court denied Appellants' motion in limine to exclude Dr. Tayeb's testimony. It held that he would be permitted to testify pursuant to the hearsay exception for reputation evidence set forth in Evid.R. 803(21). Appellants renewed their objection to Dr. Tayeb's testimony before it was read to the jury. The trial court overruled the objection, stating that Dr. Tayeb's testimony was "reputation as to Durrani's character" and was "among his associates or within the community that he worked in."

{¶90} When ruling on Appellants' motion for a new trial on this ground, the trial court found that, pursuant to this court's recent holdings in *Stephenson v.*

30

*Durrani*, 2023-Ohio-2500 (1st Dist.), and *Densler v. Durrani*, 2024-Ohio-14 (1st Dist.), it had erred in admitting Dr. Tayeb's testimony as "habit" evidence pursuant to Evid.R. 406 without requiring Weisman and Jones to lay a sufficient foundation for the testimony. But the court further held that the record failed to show that the jury would not have reached the same conclusion had Dr. Tayeb's testimony not been admitted, and that there was no reversible error.

**{¶91}** There is a glaring issue with the trial court's ruling—the court had not admitted Dr. Tayeb's testimony as "habit" evidence pursuant to Evid.R. 406, but rather as evidence of Durrani's reputation pursuant to Evid.R. 803(21).

**{¶92}** In *Stephenson* and *Densler*, the cases referenced by the trial court, we considered whether the trial court had erred in admitting nearly identical testimony from Dr. Tayeb. In both of those cases, the trial court had allowed Dr. Tayeb's testimony as "habit" evidence pursuant to Evid.R. 406. *Stephenson* at ¶ 29; *Densler* at ¶ 16. We held in *Stephenson* that the trial court erred in allowing Dr. Tayeb's testimony because there was no "proper foundation established to demonstrate evidence of habit under Evid.R. 406." *Stephenson* at ¶ 34. We explained that Dr. Tayeb's testimony was "remarkably vague" about how often Durrani made these comments, and that no explanation was provided about what "stimulus [] evoked the alleged habitual response." *Id.* We reached the same conclusion in *Densler*, relying on *Stephenson* to hold that the trial court abused its discretion in admitting the testimony because a sufficient foundation for its admissibility had not been established. *Densler* at ¶ 18.

**{¶93}** In *Stephenson* and *Densler*, Dr. Tayeb's testimony was admitted pursuant to Evid.R. 406, which provides that "[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or

organization on a particular occasion was in conformity with the habit or routine practice." In contrast, in the case at bar Dr. Tayeb's testimony was admitted under Evid.R. 803(21), which provides that "[r]eputation of a person's character among the person's associates or in the community" is not excluded by the hearsay rule.

**{¶94}** Regardless of which rule the trial court relied on to admit Dr. Tayeb's testimony, it was admitted in error. Had the trial court, in fact, admitted the testimony pursuant to Evid.R. 406 as habit evidence, the admission would have been erroneous pursuant to *Stephenson* and *Densler* because no foundation was established for its admissibility. *See Stephenson,* 2023-Ohio-2500, at ¶ 34 (1st Dist.); *Densler,* 2024-Ohio-14, at ¶ 18 (1st Dist.).

**{¶95}** Dr. Tayeb's testimony was also inadmissible under Evid.R. 803(21). Before testimony about a defendant's reputation in the community may be offered, "the proper foundation must be laid establishing that the witness had the means of knowing the victim's reputation." *State v. Collins*, 1987 Ohio App.LEXIS 8045, *19 (12th Dist. July 27, 1987). When laying the required foundation, "[i]t is not enough that such testimony be based upon what some or a few others have said regarding the reputation of the victim," and "[m]ere rumors are not reputation because reputation involves a notion of the general estimate of a person by the community as a whole. Reputation is not what a few persons say or may think about the party in question; rather, it is what the community generally believes." *Id.*

**{¶96}** The testimony offered by Dr. Tayeb did not constitute "reputation" testimony as contemplated by Evid.R. 803(21). The testimony did not address Durrani's character or what the community as a whole thought or believed about him. Rather, it addressed Durrani's pattern of using scare tactics to encourage patients to undergo surgery and it encapsulated only the opinion of Dr. Tayeb.

**{¶97}** We accordingly hold that the trial court erred allowing Dr. Tayeb's testimony to be read to the jury. As with the trial court's error regarding joinder, we consider the impact of this error in conjunction with the other evidentiary errors committed by the court.

### C. Dr. Saini's Testimony

**{¶98}** Appellants argue that the trial court improperly allowed Dr. Saini to testify beyond his expertise as a radiologist in multiple instances.

**{¶99}** Evid.R. 702 governs expert testimony. It provides in relevant part that a witness may testify as an expert when "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). An expert testifying in a medical-malpractice action "need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." (Cleaned up.) *Ravenscraft*, 2025-Ohio-2900, at ¶ 139 (1st Dist.). Whether a witness is qualified to testify as an expert is within the trial court's discretion. *Adams v. Durrani*, 2022-Ohio-60, ¶ 44 (1st Dist.), *overruled on other grounds by Fenner v. Durrani*, 2025-Ohio-4477 (1st Dist.).

**{¶100}** This court has been confronted with similar challenges to Dr. Saini's testimony in multiple cases. Our case law establishes that Dr. Saini's testimony must be evaluated on a case-by-case basis to determine whether the challenged testimony exceeded the scope of Dr. Saini's expertise as a radiologist.

**{¶101}** Appellants challenge multiple statements made by Dr. Saini with respect to Durrani's treatment of Jones. They argue that the trial court erred in allowing Dr. Saini (1) to criticize Durrani's choice to schedule surgery on Jones before

obtaining updated medical images, (2) to comment on Durrani's operative notes and opine on what surgeons "are supposed" to write down, (3) to opine that Durrani should have operated more extensively, (4) to testify that Durrani used the wrong hardware and opine on the impact of that decision, (5) to testify about the purpose of cages in spinal fusion, (6) to opine that Durrani should have ordered more conservative care for Jones before operating, and (7) to explain the differences between several of the nonfusion procedures that Durrani planned to perform on Jones. We address each contention in turn.

{¶102} Dr. Saini testified that when Durrani evaluated Jones, he relied on MRI images that were nine months old. Dr. Saini stated, "I generally go and tell people, hey, you need to do an MRI within one to two months because things can change." As a radiologist, this testimony was within the bounds of Dr. Saini's knowledge and expertise.

{¶103} With respect to Durrani's operative notes, Dr. Saini testified that "when you write an operative note, you're supposed to write down what your diagnosis is before you do the surgery and after you do the surgery and what exactly did you do." He noted that Durrani's operative report failed to reference what procedure Durrani had done at the L4-5 level and that the patient had to be taken back into surgery. He further noted that Durrani failed to file an addendum to his report regarding the second surgery on Jones.

{¶104} We cannot hold that this testimony exceeded the bounds of Dr. Saini's expertise as a radiologist. His testimony established that he frequently read medical reports, particularly those interpreting medical images. Simply noting that a report failed to reflect the procedure that a surgeon had planned to perform is certainly within the knowledge of a radiologist. Dr. Saini also testified that he was trained to

make sure "there there's no alteration of medical record[s]," and that, when necessary, addendums to reports should be made. We additionally note that Dr. Saini was not the only witness to offer testimony of this ilk. Dr. Bloomfield and Dr. Wilkey similarly testified that Durrani's operative report failed to mention a procedure performed at the L4-5 level and that Durrani failed to document the second surgery on Jones.

{¶105} Appellants' next challenge is to Dr. Saini's testimony about what Durrani *should have* done when operating on Jones. Dr. Saini testified, "And what should have been done is there should have been surgery done at L3 all the way to L5." We agree that this testimony was improper. Dr. Saini was qualified to discuss the conditions depicted on Jones's medical images. But determining the type of surgery necessary to correct those conditions fell within the purview of a surgeon. Dr. Saini's testimony established that it was necessary for him to understand the procedures that doctors propose and perform so that he can assist them during surgery. But he did not testify that he was trained to determine when a particular procedure should be performed. We accordingly hold that this testimony fell outside of the bounds of Dr. Saini's expertise as a radiologist.

{¶106} Appellants challenge Dr. Saini's testimony that Durrani used the wrong hardware on Jones. On this point, Dr. Saini stated that "[Durrani] used the wrong hardware," and explained that the hardware used on Jones was different than what Durrani stated had been used in the operative report. Dr. Saini provided no testimony to establish that, as a radiologist, he was trained in determining what type of hardware should be used in a particular surgery. Thus, his testimony that Durrani "used the wrong hardware" arguably fell outside the bounds of his expertise. However, this testimony was duplicative of that offered by other witnesses. Both Dr. Bloomfield and Dr. Wilkey testified that Durrani used the wrong hardware. We take no issue with the

remainder of Appellants' challenge to Dr. Saini's testimony about the hardware. Where the hardware actually placed in the patient did not match the type of hardware reflected in the operative report, Dr. Saini's testimony noting this discrepancy was fair commentary.

{¶107} Appellants next assert that Dr. Saini was improperly allowed to testify about the purpose of cages in spinal fusions. Dr. Saini testified that "when you put the cage in, what you're trying to do is trying to create stability anteriorly between the two vertebral bodies, and you want bone to form between the two vertebral bodies." He stated that cages were used to stabilize disc height. Appellants fail to explain exactly how this testimony was improper, and we hold that it was not. As a radiologist familiar with various procedures performed on the spine, Dr. Saini was qualified to testify about the purpose of a cage.

{¶108} Appellants' next challenge is to Dr. Saini's statement that Durrani should have ordered additional injections and done a radio frequency ablation before performing surgery on Jones, as opposed to ordering these treatments after surgery. We agree that this testimony exceeded the bounds of Dr. Saini's expertise and was improperly admitted. Determining the specific treatments and procedures that a patient should receive falls under the purview of a surgeon, not a radiologist. Dr. Saini offered no testimony that he was trained or qualified to make these recommendations and determinations.

{¶109} Appellants last challenge Dr. Saini's testimony explaining the differences between some of the nonfusion procedures that Durrani planned to perform on Jones. Dr. Saini explained both a decompression and a foraminotomy. Where he also testified that he is often called to assist in surgeries, and that he necessarily needs to be familiar with different procedures upon which he may be called

to assist, we hold that this testimony did not exceed the bounds of his expertise.

{¶110} In summary, while many of the challenged statements from Dr. Saini's testimony were properly admitted, several others were not. We accordingly hold that the trial court abused its discretion in allowing Dr. Saini to offer testimony in several instances that fell outside the bounds of his expertise as a radiologist.

## D. Cumulative Expert Testimony

{¶111} Appellants argue that the trial court improperly allowed Jones and Weisman to present cumulative expert testimony. Their challenge is predominately to the testimony offered by neurosurgeon Dr. Bloomfield and orthopedic spine surgeon Dr. Wilkey. They contend that these experts were both spine surgeons and that their testimony was cumulative and overlapped. They further argue that, although Dr. Saini testified from the perspective of a radiologist rather than a surgeon, his testimony offered a cumulative, third criticism of Durrani's interpretation of the medical images.

{¶112} Appellants objected at trial to the presentation of this allegedly cumulative evidence. Dr. Bloomfield was the first expert to testify. During a break in his testimony, Appellants moved to strike Dr. Wilkey's upcoming testimony, arguing that it would be duplicative to that offered by Dr. Bloomfield. The following discussion took place between the trial court and counsel.

> DEFENSE COUNSEL: Based upon the exhaustive nature of Dr. Bloomfield's direct examination, I'm going to move to strike Dr. Wilkey's testimony because this is clearly going to be duplicative. There is no reason to have Dr. Wilkey come in and testify. We always go with one surgery expert. It's just completely cumulative. It's a waste of judicial resources. And it's completely unnecessary. It adds nothing. It can't possibly add anything to the comprehensive nature of his opinions

and—and I will also object to the very leading questions.

. . .

PLAINTIFFS' COUNSEL: Well, Dr. Wilkey will be doing the general anatomy of the spine that's related to this—these two patients as well as giving information about being an orthopedic spine surgeon and how that compares to a regular orthopod. And we have now done quite a few trials. And my conversations with the jurors, they find the explanation from the two doctors to be very helpful in their determining what has happened in the case.

DEFENSE COUNSEL: That's, in my opinion, flimsy justification for having a second expert come in and drone on for four or five, six hours about the same exact material that Dr. Bloomfield exhaustively covered. And if that's—we've got a lot of trials left. We're going to start identifying a second orthopedic expert.

THE COURT: Okay. First of all, your request about barring Dr. Wilkey, the Court at this time will not do that. Your request there is denied.

**{¶113}** We review the trial court's admission of evidence, including its decision to allow multiple expert witnesses to testify for a party, for an abuse of discretion. *Werden v. Children's Hosp. Med. Ctr.*, 2006-Ohio-4600, ¶ 86 (1st Dist.). Our determination as to whether the trial court erred in admitting cumulative expert testimony is guided by Evid.R. 403. This rule provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or *needless presentation of cumulative evidence.*" (Emphasis added.) Evid.R. 403(B). We have defined cumulative evidence as "additional evidence of the same kind to the same point." (Cleaned up.) *Tyra v. Griffith*, 2025-Ohio-912, ¶ 55 (1st

Dist.).

**{¶114}** This court was presented with a similar challenge to the presentation of cumulative expert testimony in *Werden*. *Werden* at ¶ 86. Our review of the record in *Werden* revealed duplicative testimony from the defendants' expert witnesses. But because "the standard-of-care testimony related directly to the [plaintiffs'] theory of medical malpractice," we held that "despite its cumulative nature, the testimony's probative value outweighed any potential harm." *Id*. at ¶ 89-90.

**{¶115}** Here, the trial court denied Appellants' request to exclude Dr. Wilkey's testimony as cumulative without explanation. It never determined whether Dr. Wilkey's testimony was, in fact, cumulative to that offered by Dr. Bloomfield, or whether, if it was cumulative, the probative value of the testimony outweighed any potential harm.

**{¶116}** The testimony offered by Dr. Bloomfield and Dr. Wilkey was indisputably duplicative. While each did offer some testimony that the other did not, their testimony overlapped on all major opinions related to the underlying theory of malpractice. Each testified that Durrani breached the standard of care by exaggerating the findings on the plaintiffs' medical images to induce them to undergo surgery. And each expert testified that the surgeries performed on the plaintiffs were not medically indicated. The testimony of these two experts overlapped not only on their general opinion as to whether Durrani met the applicable standard of care in his treatment of Weisman and Jones, but also on more specific details about the treatment rendered by Durrani. For instance, both experts were critical of Durrani's operative report regarding the surgery performed on Jones, including his failure to mention the surgery performed at L4-5 and his omission of the fact that he had to take Jones back into the operating room for a second procedure.

**{¶117}** We hold that the testimony offered by Dr. Bloomfield and Dr. Wilkey was cumulative—it was "evidence of the same kind [that went] to the same point." (Cleaned up.) *See Tyra*, 2025-Ohio-912, at ¶ 55 (1st Dist.). And unlike in *Werden*, even though this testimony went to the plaintiffs' underlying malpractice theory, we cannot find that its probative value outweighed its potential harm. *See Werden*, 2006-Ohio-4600, ¶ 89-90 (1st Dist.).

**{¶118}** This case came down to a battle of the experts. And while the "battle" touched on whether Durrani had competently performed surgery on Weisman and Jones, its central focus was on whether Durrani had accurately interpreted the plaintiffs' medical images and whether he had fraudulently misrepresented the images to induce the plaintiffs to undergo unnecessary surgeries. Dr. Wilkey's testimony duplicated the already lengthy and detailed testimony offered by Dr. Bloomfield criticizing Durrani. And keep in mind that these were not the only two experts to testify for Weisman and Jones. While we are not troubled, generally, by the admission of Dr. Saini's testimony,[8] which was offered from the perspective of a radiologist rather than a surgeon, his testimony did present a third criticism of the care and treatment rendered by Durrani. Appellants, in contrast, presented two experts—a radiologist and a neurosurgeon. Where the cases were, for all intents and purposes, decided based on which experts the jury elected to believe, any probative value offered by the duplicative expert testimony was outweighed by its potential harm.

**{¶119}** We accordingly hold that the trial court erred in admitting cumulative expert testimony from Dr. Bloomfield and Dr. Wilkey.

---

[8] Obviously, this statement excludes the previously identified testimony from Dr. Saini that we have found exceeded the bounds of his expertise as a radiologist.

### E. Jury Instruction on Durrani's Absence

**{¶120}** Appellants last argue that the trial court improperly instructed the jury on Durrani's absence.

**{¶121}** This court has reviewed identical instructions in multiple cases, including *Jones*, 2024-Ohio-1776, at ¶ 30-40 (1st Dist.), *Courtney*, 2025-Ohio-2335, at ¶ 84-87 (1st Dist.), *Ravenscraft*, 2025-Ohio-2900, at ¶ 130-137 (1st Dist.), and *Fenner*, 2025-Ohio-4477, at ¶ 69-74 (1st Dist.). In each of these prior cases, we held that the instruction provided by the trial court was erroneous, but we found the error to be harmless because the instructions as a whole did not mislead the jury. *Jones* at ¶ 37; *Courtney* at ¶ 86-87; *Ravenscraft* at ¶ 136; *Fenner* at ¶ 74. We conclude likewise here, and we find no reversible error in the trial court's issuance of this instruction on Durrani's absence.

**{¶122}** Appellants additionally argue that, on the issue of an absent-defendant jury instruction, this court's opinion in *Jones* is in conflict with *Hounchell*, 2023-Ohio-2501 (1st Dist.), and that the two opinions cannot be squared. We disagree.

**{¶123}** As previously explained, the instruction in *Jones* was identical to that provided in the case at bar. *See Jones* at ¶ 30. For ease of comparison, we restate that instruction here:

> The defendant, Dr. Durrani, did not attend these proceedings in person. He is represented here by counsel. You shall not speculate on why he is not present or consider his absence for any purpose except as instructed below.
>
> Dr. Durrani has voluntarily left the jurisdiction removing himself from plaintiff's ability to subpoena him to trial. When a party such as Dr. Durrani has relevant evidence or testimony within his or her control,

41

and the party failed to produce that relevant evidence or testimony, that failure gives rise to an inference that the evidence or testimony is unfavorable to that party.

*Id.*

**{¶124}** In *Hounchell*, the trial court instructed the jury, "You are allowed to consider as part of your deliberation the fact that Dr. Durrani did not attend the trial and testify to specific facts about this case in his defense. And you may make whatever inference and conclusions you choose to from that fact." *Hounchell* at ¶ 65. We held that the trial court abused its discretion in providing this instruction. *Id.* at ¶ 70. We explained,

> The instruction invited the jury "to make whatever inference and conclusions" it desired from Durrani's failure to attend trial, including ones precluded by law. By giving the jury the ability to draw any inference or conclusion, the jury was permitted to draw both impermissible and negative inferences. The conclusions allowed by the instruction, but prohibited by law, would include the inference that Durrani was absent from trial because he had been negligent in his treatment of Hounchell or an assumption of liability based on racial prejudice against Arab-Americans. In other words, it allowed the jury to infer that Durrani was absent because of a consciousness of guilt or because of implicit biases against those of Pakistani descent, both of which are impermissible.

*Id.* at ¶ 69.

**{¶125}** *Jones* and *Hounchell* are not in conflict. This court found *both* instructions to be erroneous. The instruction in *Hounchell* was in error because it

allowed the jury to draw impermissible inferences. *Hounchell* at ¶ 69-70. The instruction in *Jones* was in error because it "was not permissive nor limited to evidence that would naturally be produced." *Jones*, 2024-Ohio-1776 at ¶ 34 (1st Dist.). However, because the jury in *Jones* was also provided a general inference instruction and told that whether to make an inference was within the jury's discretion, we found that the jury instructions as a whole were not misleading. *Id*. at ¶ 37.

{¶126} Appellants argue that in recent decisions, this court has determined that *Jones* governed our review of the jury instruction provided by the trial court on Durrani's absence and failed to mention *Hounchell*. To the extent that this assertion is true, we did so because the instructions at issue in these cases, including the case at bar, were identical to the instruction provided in *Jones*, not *Hounchell*. For the foregoing reasons, we reject Appellants' argument that *Jones* and *Hounchell* are in conflict and cannot be squared.

### F. Cumulative Error

{¶127} We have found error in (1) the trial court's improper joinder of Weisman's and Jones's claims for trial, (2) the improper admission of hearsay testimony from Dr. Tayeb, (3) the trial court allowing Dr. Saini to testify beyond the bounds of his expertise in multiple instances, and (4) the trial court allowing cumulative expert testimony from Dr. Bloomfield and Dr. Wilkey. Appellants argue that the cumulative effect of these errors warrants a new trial.

{¶128} "An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 35. To determine whether an error affected a party's substantial rights, we must weigh the prejudicial effect of the error and ask whether the jury probably would have reached

the same result had the error not occurred. *Bender v. Durrani*, 2024-Ohio-1258, ¶ 93 (1st Dist.).

**{¶129}** Collectively, these errors cannot be held harmless. The cases put forth by Weisman and Jones were close. The jury found in favor of Appellants on each plaintiff's claims for failure to acquire informed consent and battery. It also found that while Durrani had been negligent in his care of both plaintiffs, that negligence was not the proximate cause of either plaintiff's harm. The verdicts were not overwhelmingly in favor of either party.

**{¶130}** In a case that came down to a battle of the experts, it was extremely prejudicial for the jury to hear cumulative testimony from the plaintiffs' experts. The resulting prejudice was compounded by the pejorative testimony improperly offered by Dr. Tayeb without a proper foundation and the improper testimony from Dr. Saini in which the trial court allowed him to opine beyond the bounds of his expertise.

**{¶131}** Further, the trial court's improper joinder allowed the jury to hear testimony about identical claims asserted by another plaintiff that, absent joinder, would not have been otherwise admissible. *See Stephenson*, 2023-Ohio-2500, at ¶ 47 (1st Dist.) ("Ohio courts tend to recognize that absent a finding of malpractice, evidence of the existence of a prior medical malpractice case is properly excluded, as unfairly prejudicial." (Cleaned up.)). And while the trial court instructed the jury that each plaintiff's claims must be considered separately, plaintiffs' counsel made comments during opening statements that were in contravention of this instruction. In several instances, counsel made joint arguments and referred to "both these cases." For example, when discussing how Durrani had exaggerated the findings on each plaintiff's medical images, counsel stated, "[A]nd we're going to see that in these cases." Similarly, when discussing Durrani's record keeping, counsel stated, "[W]hat

you're going to find in both of these cases is there are a lot of missing records." Counsel's collective references and arguments lumped the plaintiffs' claims together in the eyes of the jury.

**{¶132}** Dr. Saini also compared the two plaintiffs' medical images when testifying. As he discussed Jones's images, he stated "And, remember, in the prior study, people talk about capsulosynovitis. Well, this is a facet joint here. And when you have capsulosynovitis, this is the fluid that you typically see in capsulosynovitis. *You don't see this in the last study.*" (Emphasis added.) The "last study" referred to Weisman's case. Appellants objected to Dr. Saini's comparison of the plaintiffs' cases, but the trial court overruled the objection, stating, "I think the jury is able to distinguish the two." Dr. Saini also compared the intake forms, or lack thereof, filled out by each patient when presenting to Durrani for the first time. Had Jones's and Weisman's cases been tried separately, Dr. Saini would not have been able to compare one plaintiff's case when discussing the other plaintiff's case.

**{¶133}** On these records, we cannot hold that the jury would have reached the same results had these errors not occurred. Cumulatively, the error resulting from the erroneous joinder and the various evidentiary errors committed by the trial court was not harmless. We accordingly hold that the trial court erred in denying Appellants' motion for a new trial in Jones's case,[9] and we sustain the second assignment of error and the third assignment of error in part and overrule them in part.

**{¶134}** Appellants' remaining assignments of error, in which they challenge the trial court's failure to allow a setoff and its award of prejudgment interest, are rendered

---

[9] Because we have already held that the trial court erred in failing to grant the Appellants' motion for a directed verdict on Weisman's claims, we need not rule on the trial court's denial of Appellants' motion for a new trial and/or judgment notwithstanding the verdict on Weisman's claims.

moot and we do not address them.

### *IV. Conclusion*

{¶135} For the foregoing reasons, the trial court's judgments are reversed. The cause is remanded for the trial court to enter judgment in favor of Appellants on Weisman's claims and for a new trial on Jones's claims.

Judgments reversed and cause remanded.

NESTOR, J., concurs.
MOORE, J., concurs in part and dissents in part.

MOORE, J., concurring in part and dissenting in part.

{¶136} For the reasons set forth in my dissent in *Wilson*, 2026-Ohio-2279 (1st Dist.) (Moore, J., dissenting), I respectfully dissent with respect to joinder and the court's consideration of joinder in its cumulative-error analysis. For the reasons explained in my dissent in *Wilson*, the majority's application of Civ.R. 23's meaning of commonality when interpreting joinder under Civ.R. 42 is improper. *Id.* at ¶ 125. Because I do not conclude that joinder was improper, I also conclude that, the remaining errors relied on by the majority are insufficient to support a reversal based on cumulative error in Jones's case. Consistent with my view that a reversal is not merited in Jones's case, I also conclude that the challenges to the trial court's failure to allow a setoff and to award prejudgment interest are not moot, and as in previous cases those issues should be remanded to the trial court. However, I concur with all other facets of the majority's opinion.